The case is taken under advisement. Our final case of the day is Emory Investments against Utrecht-America Holdings. Mr. Gant. Good morning, Your Honors. May it please the Court. Scott Gant for the appellants, plaintiffs for the District Court. This appeal arises from a large, administratively and procedurally complex and challenging case, but the issue on appeal we submit is simple and we respectfully submit also has a straightforward answer. Have appellants plausibly alleged a Sherman Act Section 1 claim against the defendant Rabobank? The District Court did not cite or discuss any cases in its short order dismissing plaintiffs' claims against Rabobank, but it certainly appears to have been attempting to apply the plausibility standard announced by the Supreme Court in Twombly. The District Court, however, made numerous errors, which led it to erroneously conclude that a cause of action had not been plausibly pled against Rabobank. We assume you are very familiar with our briefs, so you are aware, Your Honors, that we contend there were three basic clusters of errors in that short opinion. Mr. Gant, can you address, please, what you think your strongest allegations or allegations are that Rabobank knew about the alleged conspiracy? Yes, Your Honor. We, I'm going to directly answer your question in a moment, but because this is a complicated case, I want to make sure the Court understands one thing, which is that the complaint, which is a part of our appendix, incorporated by reference a 400-page complaint that all the direct action plaintiffs were ordered by the District Court to file jointly. Yes, I'm aware of that. I found that in the over 4,000 entries in the docket. Yes, my understanding is that we have broken by far the record for the most DCF filings in the Northern District of Illinois, which is a dubious distinction. You may have. I think the two clearest pieces of evidence, and Rabobank has put these— Again, allegations, not evidence, but— It does say we have to put forward evidence, but I think the appropriate standard is allegations. But we did have some discovery from Rabobank as a third party, and there were two emails that Rabobank has included in its supplemental appendix, which we refer to as the old production gospel emails. Those are at Supplemental Appendix 8 and 11. And those are two emails from 2011 on consecutive days from executives at Rabobank to producer, we allege, co-conspirators of Rabobank. One was Purdue, and one was Pilgrim's Pride. And if I may refer to them directly, they both use the phrase old production cuts. And the first in time was from February 24, 2011. And that was an email to an executive at Pilgrim's Pride, CEO of Pilgrim's Pride named Bill Lovett. So this is Supplemental Appendix 11. It introduces—it's from an executive named Adrian Westratt at Rabobank, who was the head of their chicken consulting business in the United States. And at the end of the email, it says, I think we will see some shakeup in the industry this year unless we suddenly get some price increases in BSBM. That's boneless, skinless breast meat. That's what that acronym is. And corn comes down. Both, unfortunately—both are, unfortunately, unlikely. So we are left with the old, open quotes, production cuts, close quotes, gospel, followed by two exclamation points. And in your honors— Counsel, is that your best evidence? At this— I wonder how it helps you. What bugs me about this is the substantive holding of Twombly, not the procedural holding. The substantive holding is that a complaint doesn't state an antitrust claim if all it alleges is that the defendant acted in its own self-interest. In other words, it has to allege something that the defendant has acted in a way that only if coordinated, only if other entities do the same thing. And I wonder how your complaint alleges that. Certainly what you've just referred to doesn't do that. It talks about the independent self-interest of the lender. Well, I want to directly answer your question, Judge Easterbrook, but I want to do so in part by referring to the other email because I think these two need to be read in tandem along with the rest of them. And of course, as you know very well, your honor, engaging in conspiratorial conduct can be in the self-interest of the participant. So the question is whether they engaged in the lawful pursuit of self-interest or whether they conspiratorially engaged in pursuing self-interest. There's no question here that Rabobank had a substantial financial interest in the performance of the boiler producer. I wish you'd address my question, which is how the complaint alleges that Rabobank was in a way that was not in its unilateral self-interest. What it was doing was it knew that if, one, that all the producers needed to act together. It's very clear in the complaint and in – Yeah, it knew that. Anybody who has looked at a downward-sloping demand curve knows that. I wish you'd address my question. I'm attempting to. So what it did is because it knew that the industry needed to act together is it worked with the participants, the boiler producers, their 19 producer defendants, and went to them and said, you need to work together. If you don't work together, this isn't going to work. You're all going to fail. It gave them particular amounts that it believed it needed to cut and in these two emails, which, again, we were only at the pleading stage and we believe that the district court erroneously held us to a higher standard because there already had been some discovery of Rabobank as a third party. But in this second email, which is at supplemental appendix 11 – sorry, at 8, the next day, this is with producer Purdue. They said, in relevant part, this is Rabobank to Purdue. You can count on us to help you in any way possible to get through this downside. Yes, but did it do anything, right? It has a privilege. This is actually often known as the Colgate privilege and I'm surprised no one discussed Colgate to make unilateral declarations about how other people should behave. But it didn't just do that, Your Honor. The second email is Rabobank telling Purdue that it is going to tell other producers that they need to cut. That is why that particular email – of course, you need to read it in conjunction with the email from the prior day talking about the old production cut gospel. And of course, what does gospel refer to? It's spreading the word. That word was not picked by accident. They're going to spread the word among the producers. You need to cut. And they tell Purdue. They didn't say to Purdue, we think you, Purdue, should cut. Your Honor, if that's all that happened, we had nothing else, then you might be right. But that isn't what they did. They went to Purdue and said, we're going to tell other producers that they need to cut. And why? To help you, Purdue. That is different from just pursuing unilateral sentences. I don't see it. If Colgate sends the same message to every one of its customers saying it is in our interest and yours that you engage in resale price maintenance, the Supreme Court holds that's even though agreement to engage in resale price maintenance was, at the time, unlawful per se. I hope you see my problem. It looks like what you're alleging is that Rabobank sent the kind of communication allowed, indeed expressly protected by Colgate, and did not follow up in some concrete way. If it did follow up, it's in trouble, I think. Are you alleging how it followed up? It followed up. We allege that there was an agreement, that these emails were an illustration of a broader agreement to facilitate communications among the producer participants and to convene them together and then tell them what they all needed to do to give them opportunities to reach agreements. I respectfully reject the suggestion that this is just factually by Colgate. I apologize. I don't remember the procedural posture of Colgate. As you pointed out, Rabobank didn't rely on that, so I didn't review it for the argument preparation. Of course, we're at the pleading stage. The Supreme Court is very clear, and this court has been clear, Your Honor. It was 13 years ago now, but you may remember the Swanson decision in which you joined Judge that at the pleading stage, the plausibility does not imply that the district court should decide whose version to believe or which version is more likely than not. We were at the beginning of discovery. We were entitled to 10 depositions of Rabobank under the district court's discovery orders. We were negotiating with them additional document requests. We left open the two third-party depositions that occurred because Rabobank wouldn't sign the protective order that would allow us to show them confidentially marked documents produced by other defendants at the deposition, and they didn't produce all the documents prior to the deposition, so Rabobank contested our position, but our position was those depositions were left over. So we were early in discovery. This is a pleading standard governed by Rule 8 and Rule 12. The Supreme Court's been clear that the rules control, that the courts are not allowed to impose requirements beyond those set forth by the rules. Twombly itself said, and this court said in Swanson, that Twombly is an interpretation of Rule 8. The district court simply went too far. It does what Judge Easterbrook is, we know is not permitted. The Supreme Court has said, you don't make a determination about who you think is going to be right. The question is have you plausibly set forth a claim, and we believe we have. I see my time has expired, but of course I'm happy to answer your questions at this time. Certainly, Mr. Gant. Mr. Doyle. Thank you very much, Your Honors. Good morning. May it please the Court. David Doyle on behalf of the Rabobank defendants. I do believe this appeal concerns a very straightforward application of the federal pleading standards that were articulated in Twombly-Nickball, and I also do believe that Judge Easterbrook has hit on the key legal principle that is dispositive of this appeal. When you evaluate the plausibility of Section 1 allegations, if the allegations are equally consistent with innocent conduct and participation in a conspiracy, the plaintiff has failed to state a claim. The plaintiff has not nudged the allegations across that line from consistent with or possible or conceivable to plausible. That's very clear, and in fact, a member of this panel just last year in the Marion Diagnostics Center case stated that Twombly demonstrates that courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations taken as true could just as easily reflect innocent conduct or rational self-interest. That is, respectfully, this case. All of the conduct that's attributed to— I hope it also included the word unilateral, because the classic cartel is in the self-interest of all the cartel members. Certainly, Judge. That's not enough to let it off the hook. Correct, but here, look at what they're alleged to have done. Robobank, what did it do? It monitored the chicken industry. It talked to its clients about supply restraint. It had communications with executives from poultry companies. It maybe even went so far as to say, boy, if you don't start to do something to address the economic woes of this industry, we may not be there a year or two down the road. But that is exactly the type of dialogue and exactly the type of conduct that you would expect from a major bank with hundreds of millions of dollars in lending exposure to a number of chicken producers that were facing unprecedented economic difficulties. So in each and every case, if you look at—whether you look at this evidence individually, whether you look at it collectively, it's exactly what you would expect Robobank to do. And I would submit that these preach-the-gospel emails— Really? I mean, all that it did for Robobank was land it in expensive litigation and require it to pay your legal fees, if not treble damages. Why didn't it just send everybody an article written by Joan Robinson explaining how cartels work? Well, Judge, I would submit—and I've done those CLEs and I've talked to companies about their emails, and nobody thinks that what they write—and that's a very informal mode of communication—nobody thinks that a year or two or five years or ten years down the line it's going to be produced and they're going to be questioned about it. But the bottom line, Judge, is those communications and that advice, not at all dissimilar from— and we cited in our brief, in a footnote, a number of different articles that journalists and professors and other people were saying, there's just too much chicken out there, right? So this was not an earth-shattering revelation. This was not—and most importantly, I think, for purposes of this appeal. Is there any clue in this record why whoever was writing these imprudent emails at Robobank thought that the chicken industry, of all industries, needed to know these things? There's been this drumbeat of antitrust litigation about the chicken industry for at least 50 years, maybe more. I can't answer that question, and I'll confess to you that there is nothing in the record. Mr. Westrady, who authored those emails, is no longer with us. He has passed, so there never will be an answer to that question. The industry that I trust almost rivals the fine paper industry. But I know you can't go back and deal with your client before the emails were written. Well, but, Your Honor, in defense of my client, we have an alleged massive, sprawling, 20-some entity conspiracy that went on for 11 years, and we have two emails that do not reflect industry-wide communications that were one-on-one communications with poultry executives, although, as Mr. Gantz says, there was some promise there to spread the word, but they're not at all reflective of some knowledge of a conspiracy. And another way to look at it is, as this Court is well aware, conscious parallelism or follow-the-leader conduct is perfectly appropriate, and what is it to say about these emails that that isn't what Robobank was hoping for? In other words, you, Purdue, please cut supply, because then maybe Pilgrim's Pride will do it, and then maybe Tyson will do it, and then maybe somebody else will do it, and before you know it, steps have been taken within the industry to fix the economic woes that it's experiencing. All of these communications are equally consistent with that type of hope and wishful thinking, and they're also equally consistent with Robobank's self-interest as a lender. So for those reasons, I don't think you can look – and that's a great question you asked. Give me your best evidence. What is your strongest – or excuse me, allegation. What is your strongest allegation? You put that question to Mr. Gantz, and he answered it. And in fact, the district court was very unimpressed by that and was looking to see, because the theory is that Robobank is a conduit for information, was looking to see communications amongst the chicken producers and was looking to see information conveyed by Robobank to the chicken producers that they could use and actually did use in implementing this alleged conspiracy. You don't have any of that, and I commended the court's review, and maybe you have reviewed it already, although it's a district court case and it's fairly recent. In the in-ray local TV advertising case, Judge Kendall wrote a wonderful opinion in August of last year, and the case is very similar to this one. You had a DOJ investigation. You had a horizontal conspiracy among competitors. You had a motion to dismiss filed by all those competitors and a denial of that motion. And then sometime later, they added a new defendant, and that defendant was not a part of the industry, was not a broadcaster, but was somebody that was supplying information to broadcasters that supposedly could be used to facilitate the conspiracy. We cited this case in our brief. I'm not sure how helpful that case is to you, though, because the court relies a lot on this opinion in this case that's being challenged for its reasoning. So if there were separate reasoning, I would understand your point, but there's heavy reliance on Judge Durkin's opinion in this case that's now on appeal. So I think your argument only gets you so far based on reliance on that opinion. I think that's fair, but I think there's a reason for that. You don't see a lot of cases like this, right? We are not members of the alleged conspiracy that did these supposed reductions in production, right, or price fixing. We don't have any control over the means of productions. We don't have any input into the decisions that the chicken producers made. Our fortunes don't rise or fall depending on any specific reduction in price. And in that case, Your Honor, Judge Kendall did cite some other authority and looked at this theory of being a conduit for information and said, well, boy, at a minimum, you have to show how that information could be useful to the people that are supposedly implementing the conspiracy. In the case of Agristats, you have that. You have a consultant that went to the chicken producers, gathered information, distributed it to the producers in a way that was supposedly anonymized, but according to the allegation, allowed them to gain an insight into what everybody was doing, what all the competitors were doing from a pricing and production standpoint. Right or wrong, that's the allegation. And Judge Durkin found below that if they disseminated that information, which was supposed to be a critical tool in the implementation of the conspiracy, it's plausible to suggest that they deal with the conspiracy. And with Rabobank, you have nothing even remotely resembling that. Now, in the TV advertising case, there was information that was provided about inventory and pricing and things that you could at least make a colorable argument could be used and informative to the members of the conspiracy, alleged conspiracy. You don't have that here. You simply don't. And so what my opponent is left with is criticisms of the district court that I really don't think have any merit, suggesting that he ruled the way he did because Rabobank is a bank and not a chicken producer. In fact, in his first motion of this ruling, he directly contradicted that notion, suggesting that we don't know the decisional authority that Judge Durkin relied on. When you have a judge, and Judge Zaney, we're over 6,200 entries in the docket now as of this morning. Good heavens, right? We have a judge that's doing an unbelievable job administering the most massive piece of litigation I've ever heard of, much less been involved in, and he has written over 100 pages. Do you know anything about the Cook medical case? It was the first case argued this morning, a real sprawling piece. Okay. Yeah. You don't want to make comparisons. All right. You know about that case, too. Say a non-MDL case. In my little world, this is a biggie. But he wrote, and I know my time is up, but he's written over 100 pages of motion to dismiss rulings. He's a very experienced judge that is very familiar with the pleading standards in federal court, and I think he did. I can assure you that Judge Young in Cook Medical has written a lot more than 100 pages. So with that, unless the court has any other questions, on behalf of my client, we thank you for your time and your attention. We ask that this court affirm the decision of the district court to dismiss the allegations of defraud. Thank you very much. Mr. Doyle, anything further? You had a few seconds left, but I'll round you up to a minute. In Twomley, right under the off-cited passage about not imposing a probability requirement, the court said, quote, and of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and that a recovery is very remote and unlikely. That is exactly what appears to have happened here. The district court looked ahead past the actual Rule 8 and Rule 12 standards and determined he didn't think that we were going to get there ultimately. This is a motion to dismiss. We deserve the opportunity to finish discovery, including discovery since we filed our opening brief in this case where we asked Bill Lovett, the CEO of Pilgrims, the recipient of one of those production-cut gospel emails about the email, and he invoked his Fifth Amendment right against self-incrimination. We deserve the opportunity, respectfully, to go back to the district court. Narobo Bank's arguments before the court and before this court, before the district court and this court, as exemplified by their supplemental appendix, are summary judgment arguments. This is a pleading case with pleading standards. We sufficiently pled a plausible Section 1 claim, and we deserve the opportunity to go back and try and prove it. Unless there are further questions, I thank the court for its time. Thank you very much. The case is under advisement, and the court will be in recess for today.